## Case No. 1,891.

### The BRISTOL.

### NARRAGANSETT STEAMSHIP CO. v. CONNOLLY.

[6 Ben. 477.] [1]

District Court, S. D. New York. April Term, 1873.

COLLISION IN NEWPORT HARBOR — STEAMER AND BARQUE—FOG—MODERATE SPEED—SIGNALS.

1. A barque, lying at anchor, near the breakwater, off Newport, Rhode Island, was sunk by a steamboat, in the night, in a fog. The barque was lying in the channel which the steamboat usually passed through in entering the harbor in a fog. The steamboat ran at the rate of fifteen or sixteen miles an hour, till she was within about a mile of the barque, when her engine was slowed, and she ran under that slow bell, blowing her steam whistle occasionally, till very near the barque, before the presence of the barque was known, although a vigilant lookout was kept. A bell was struck on board the barque, but not in a manner adequate to arrest the attention of those on board the steamboat, and no other noise was made upon her, except that the lookout shouted, but too late to be of any avail: Held, that the steamboat was in fault in not going at a moderate speed in a fog.

2. If the barque had had a vigilant lookout, as he was bound to know the usual hour of the arrival of the steamboat, and bound to know what sound her steam whistle would make, he could, by seasonably making adequate noises on the barque, have made her presence and position known, in season to have enabled the steamboat to avoid her. The making of such noises was a precaution required by the ordinary practice of seamen, and the special circumstances of the case, and the barque was, therefore, also in fault, and the damages must be apportioned.

[In admiralty. Libels by the master and chief officer of the barque Bessie Rogers against the steamer Bristol, and by the Narragansett Steamship Company, owners of the steamer, against Charles Connolly, owner of the barque, for damages caused by collision. Interlocutory decree for apportionment of damages.]

J. H. Choate and D. D. Lord, for the barque.

Beebe, Donohue & Cooke, for the steamboat.

BLATCHFORD, District Judge. The libel in the first of the above cases is filed by the master and the chief officer of the Barque B. Rogers, against the steamboat Bristol, to recover, on behalf of the owner of the barque, and of the owner of the cargo, and of the

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

libellants, the damages sustained in consequence of the sinking of the barque, through a collision which took place between her and the steamboat Bristol, about half past three o'clock in the morning of the 10th of August, 1872, just outside of the light on the north end of Goat Island breakwater, off Newport, Rhode Island, the barque being at anchor, and the steamboat being on a voyage from New York to Newport, and there being a thick fog at the time. The libel in the other case is filed by the owners of the steamboat against the owner of the barque, to recover the damages sustained in consequence of the sinking of the steamboat through the same collision.

The libel against the steamboat avers, that the barque entered the harbor of Newport, on the 8th of August, 1872, at about five o'clock in the afternoon, and was anchored under the direction of a duly licensed branch pilot, between the Newport harbor light and Rose Island, in a safe and proper and usual anchorage ground for vessels, and out of the usual track of steamers as well as other vessels; that the steamboat struck the port side of the barque about amidships, cutting into her about 18 feet; that the steamboat was running, at the time of the collision, at a high and imprudent rate of speed, about 12 knots an hour; that the weather, at the time, was foggy; that the barque had her light set, and burning brightly, and the steamboat was hailed, and the bell of the barque was rung, in time to avoid the accident, if the steamboat had been reduced to a proper rate of speed; and that the collision occurred through the mismanagement of the steamboat, in going out of her usual course, and at an improper rate, in port, and through a common anchorage ground for vessels, and in neglecting the warning given by the barque's light, and the hail and signal bell of her watch. The answer to this libel avers, that the barque was anchored directly in the track of the steamboat and her consort; that the steamboat was proceeding at a low rate of speed, as low as possible, with the most vigilant lookout and attention; that the barque had no watch; that her bell or signal was not rung or sounded; that no signal light or lights, as required by law, were shown or used on her, and she was, in all respects, most negligently managed; and that the collision was entirely the fault of the barque, for want of a lookout, for want of proper signal lights, and in lying, as she was, without giving any signal of her position.

The libel against the owner of the barque avers, that, before the steamboat reached Newport, a fog set in, and the speed of the steamboat was properly reduced; that the barque was found in the direct track of the steamboat, when the steamboat was near her dock, without any notice or signal from the barque, the barque being so near as to prevent the steamboat from clearing her; that

the steamboat was at once stopped and backed, and all the means possible taken, to avoid a collision; that the steamboat had her lights properly set and burning, was blowing proper signals, and had a proper watch set and looking out; that the collision was caused wholly by the fault and want of care and attention of those on the barque, in anchoring where they did, in not having proper signals, and in having no lookout or watch; and that the same could not have been avoided by those on the steamboat. The answer to this libel avers, that there was no reduction whatever of the speed of the steamboat until she ran into the barque; that the barque was anchored, under the directions of a duly licensed branch pilot, out of the usual or practicable and safe course for steamers; that the barque had a light in her fore rigging; that a bell was rung after the fog arose, and very shortly before the steamboat ran into her; that, during the whole night, until she was sunk, she had a competent watch on deck, and every requisite precaution was adopted to avoid accidents; and that the collision was owing entirely to mismanagement on the part of those in command of the steamboat, and especially in running out of her course, and at too high speed, in the want of a sufficient lookout, in the negligence of said lookout in attending to his duties, and in omitting to set the lights, and sound her whistle, as required by statute and general usage.

A careful consideration of the evidence in these cases leads me to the conclusion that both vessels committed faults which contributed to the collision. Even if it be conceded that McGrath, the alleged lookout on the barque, struck the bell of the barque, at some time, he did not do so in a manner adequate to attract the attention of those on board of the steamboat. He made no other noise, except to shout. The shouting was begun at a moment too late to be of any avail. The persons on watch on the steamboat were listening attentively for the purpose of hearing sounds from a vessel which might be in the way, but they heard nothing; and all the evidence goes to show, that, if an adequate sound had been made by a lookout on the barque, it would have been heard by those on the steamboat, so that she would have been able, by stopping and backing sooner, to avoid the barque. The barque was lying in a channel which the steamboat always took in a fog. The barque was bound to know this. The fog was very dense. The steamboat kept blowing her steam whistle, as she went along, and a vigilant lookout on the barque, bound to know the usual hour for the arrival of the steamboat, and bound to know what sound her steam whistle would make, could, by seasonably making adequate noises on the barque, have made the presence and position of the barque known, so as to have enabled the steamboat to avoid her. The making of such noises, under the circum-

stances of this case, was a precaution required by the ordinary practice of seamen and the special circumstances of the case. But, the steamboat was in fault in not going at a sufficiently moderate speed. She maintained her usual speed, of 15 or 16 miles an hour, until she had cleared Fort Adams, and then slowed by shutting off. At that time she was not over a mile from the barque. She did not stop or back. She had on her the headway derived from a previous speed of 15 or 16 miles an hour, and from there she continued on, under a slow bell, until she was within a few feet of the barque, and a collision was inevitable. The speed of so large a vessel, with her engine still working ahead, could not have been greatly retarded; and some idea of her rate of speed can be formed from the distance she penetrated into the barque. There is no satisfactory evidence that her speed, before sighting the barque, had been reduced below 10 miles an hour. Whatever it was, it had not been reduced to the moderate rate required, in a fog, in entering a harbor where vessels may be expected to be found lying at anchor.

There must be an interlocutory decree, in each case, for an apportionment of damages, based on the holding of both vessels to have been in fault for the collision, all other questions being reserved until the amount of the damages is ascertained.

[NOTE. For proceedings by the Great Western Insurance Company, insurers of the cargo, to compel payment of its value by the owners of the Bristol, see The Bristol, 29 Fed. 867.]